UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
JOHN DOE,                                :
                                         :
                    Plaintiff,           :        02 Civ. 8974 (DLC)
          -v-                            :
                                         :        OPINION AND ORDER
UNITED STATES OF AMERICA,                :
                                         :
                    Defendant.           :
                                         :
----------------------------------------X

Appearances:

For the Plaintiff:
Bruce H. Goldstone, Esq.
Gross, Schwartz, Goldstone & Campisi,
LLP
100 Church Street, Suite 1800
New York, New York 10007

For the Defendant:
Benjamin H. Torrance
Assistant United States Attorney
for the Southern District of New York
86 Chambers Street
New York, New York 10007


DENISE COTE, District Judge:

     On November 12, 2002, plaintiff John Doe[1] ("Doe") filed this

action against the United States (the "Government"), alleging

that its negligence in allowing unauthorized inmates to enter his

prison housing unit resulted in an assault on him, and its

negligence in failing to provide him with prompt medical

attention following the attack aggravated his injuries.[2]

------------------------

     [1] This Opinion was originally filed on April 27, 2004.  This
redacted version substitutes "John Doe" for the plaintiff's name.


     [2] A claim of medical negligence by an independent contractor
has already been dismissed.

Following discovery, the Government has moved to dismiss the complaint on the ground that Doe's assault claim is barred by an exception to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, and that the plaintiff has failed to show that any delay in providing him with medical care contributed to his injuries.  For the reasons stated below, the motion is granted.


Background

     All of the facts are undisputed or taken in the light most favorable to the plaintiff.[3]  The events described below took place on January 25, 2000.

     On January 25, Doe was an inmate at Federal Correctional Institution at Otisville, New York ("FCI Otisville").  Although a sentenced state prisoner, Doe was being held at FCI Otisville. Doe was housed with nine other inmates in a dormitory located in "Unit EA," a housing unit designated for pretrial and presentence inmates, and inmates being held at FCI Otisville on a temporary basis.  On January 25, Unit EA housed about 150 inmates.

     At approximately 6:30 p.m., Doe was lying on his bed, watching other inmates play chess, when he saw three inmates enter his dormitory.  The three inmates were not residents of Unit EA.  Doe recognized two of the three men, said hello, and returned to watching the chess game.  Soon thereafter, Doe was attacked from behind with a razor blade by the inmate who was

_____

     [3] The plaintiff's untimely Rule 56.1 statement of contested facts has been accepted without objection by the Government.

unfamiliar to him.  The inmate slashed him on the right side of
his head, severing an artery.  Doe tried to defend himself, but
had difficulty seeing because of the blood in his eyes.  The
inmate continued to attack Doe, slashing him in the hands and
face.  Moments later, the two other inmates joined the fight,
cutting Doe on his back.  The inmate whom Doe did not recognize
told Doe that "this is what happens to snitches," and pushed him
onto the bed.  As Doe fell, he struck his head on the bed frame.

During the time during which Doe was attacked, correctional
officer Wayne Rollock ("Rollock") was on duty in Unit EA, and was
stationed near the inmate entrance to the unit.  Somebody from
within the housing unit shouted that a fight was taking place, at
which point Rollock stepped into the unit and observed several
inmates, including Doe, engaged in a fight immediately outside
the third-floor dormitory room.  Rollock activated his "body
alarm," a button on his radio that alerted other prison staff to
an emergency, ordered the inmates to stop fighting, and ordered
the other inmates to "lock down," or return to their cells.  One
of the fighting inmates jumped or fell off the third floor to the
second floor, and ran past Rollock out the door.  Rollock then
saw Doe re-enter the third-floor dormitory room.  Rollock next
saw Doe being taken out of the dormitory by another prison
official and brought to Unit EA's common area, where Rollock
identified him as one of the inmates involved in the fight.
Rollock observed that Doe was bleeding heavily, but was able to
walk unassisted.

Doe contends that he was attacked during a "controlled movement," also known as a "ten-minute move."  According to Doe, "[t]hat's how those guys that attacked me got into the unit....  When there's no move, the compound is empty."

The ten-minute move in effect at the time of Doe's attack governed inmate movement between 4 p.m. and 9 p.m., and permitted inmates to move from one authorized place to another within the prison without having to carry a pass.[4]  Ten-minute moves occurred at the bottom of each hour, as well as during mealtimes, religious services, and other programmed activities.  At such times, the doors to the inmate entrance of a housing unit are unlocked.

In January 2000, inmates at FCI Otisville were prohibited from entering a housing unit to which they were not assigned.  Inmates who entered an unauthorized housing unit were subject to discipline.  During a ten-minute move, the corrections officer on duty was required to stand in or near the doors of a housing unit in order to monitor the inmates' entry into the unit.

According to Fredrick Manifee ("Manifee"), the Warden at FCI Otisville, both the ten-minute move policy and the restriction on inmates entering housing units to which they were not assigned were implemented in an exercise of his discretion as Warden.  No

---

[4]  In January 2000, a pass system was in effect from 7 a.m. to 4 p.m., Monday through Friday, except holidays.  Under the pass system, inmates who needed to move from one area to another within the prison compound were required to possess a pass.  From 9 p.m. until the morning meal was announced, inmates were confined to their housing units.

BOP regulation or policy in effect on January 25 imposed a "non-discretionary duty" upon him or any other prison official to implement any particular system for the control of prisoner movement within FCI Otisville, nor was there any regulation or policy that required prison personnel "to prevent all prisoners from entering housing units to which they were not assigned." Manifee instituted both policies based on a number of considerations, "including the safety of inmates, the ability of inmates to move about the facility, general concerns for prison security, the effective use of limited resources, and the multiple duties of and demands upon FCI Otisville's staff members."

Manifee charged prison personnel with the administration of the ten-minute move system, giving them "discretion in balancing their various duties with the tasks involved with inmate movements." Officials were responsible for "randomly checking [inmates'] identification cards," using their judgment to determine how frequently to check the identification cards, "and, more specifically, whose cards to check." If an officer did not recognize an inmate, he could verify the inmates' residence in several ways: by checking the inmate's identification card, which may or may not have specified the correct housing unit; by comparing the inmate's name against the unit's daily printed roster; by contacting the prison's control center to determine the inmate's proper residence; or by relying on the inmate's word. According to Manifee, the "ultimate responsibility" for

complying with the controlled-movement system "rest[ed] with the prisoner," not the prison official.

Rollock asserts that during a ten-minute move officers checked inmates' identification cards "at random"; the officer "was not required to check the ID card of every inmate entering the unit." According to Rollock, he would "regularly change the ratio of inmates" from whom he required identification "so as to be unpredictable." Rollock would also typically "challenge" inmates whom he did not recognize. During the ten-minute moves, however, "there would often be as many as forty inmates waiting to get into the unit," so he sometimes would "not be able to identify every inmate" as somebody he knew or did not know as belonging in the unit.

Rollock declares that on January 25 he obeyed the prison policy for supervision of the ten-minute moves. According to Rollock,

> [a]t all times during my shift at Unit EA on January
> 25, 2000, the decisions I made about where to look,
> where to be, which inmates to search, which inmates'
> IDs to check...were based on my judgments about how
> best to maximize the inmates' safety, institutional
> security, inmates' compliance with rules, and inmates'
> ability to get where they needed and were authorized to
> go.

Rollock states that he was never informed of any statute, regulation or FCI Otisville policy that required "me to balance all these considerations in any particular way; it was left to my judgment and discretion how to do so in the way I thought best." At no time during Rollock's shift was he aware of any "unauthorized inmate entering Unit EA," nor did he "intentionally

or knowingly permit any unauthorized person to enter Unit EA."

Discussion

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed. R. Civ. P.; accord Burt Rigid Box, Inc. v. Travelers Property Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

The Discretionary Function Exception

Through the FTCA, the Government has waived its sovereign immunity from suits for the negligent or wrongful acts of its employees. The exceptions to this waiver include an exception for

> [a]ny claim based upon an act or omission of an
> employee of the Government, exercising due care, in the

7

> execution of a statute or regulation, whether or not
> such statute or regulation be valid, or based upon the
> exercise or performance or the failure to exercise or
> perform <u>a discretionary function or duty</u> on the part of
> a federal agency or an employee of the Government,
> whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis supplied).  Two conditions must be

met in order for the discretionary function exception to bar a

tort suit against the Government: "(1) the acts alleged to be

negligent must be discretionary, in that they involve an 'element

of judgment or choice' and are not compelled by statute or

regulation and (2) the judgment or choice in question must be

grounded in 'considerations of public policy' or susceptible to

policy analysis." <u>Coulthurst v. United States</u>, 214 F.3d 106, 109

(2d Cir. 2000) (citing <u>United States v. Gaubert</u>, 499 U.S. 315,

322-23 (1991), and <u>Berkovitz v. United States</u>, 486 U.S. 531, 536-

37 (1988)).  If a regulation, rule, or statute "allows the

employee discretion," a "strong presumption" arises that the

employee's acts "are grounded in policy when exercising that

discretion." <u>Gaubert</u>, 499 U.S. at 324.  If a claim falls within

the exception, the Court lacks subject matter jurisdiction over

the claim.  <u>Fazi v. United States</u>, 935 F.2d 535, 537 (2d Cir.

1991).

The interplay between the first and second prongs of the

<u>Gaubert-Berkowitz</u> test means that certain acts, although

discretionary, are not covered by the exception because they

involve "negligence unrelated to any plausible policy objective."

<u>Coulthurst</u>, 214 F.3d at 111.  For example, a Government employee

who falls asleep while driving her car on official duty is not

8

protected by the exception because her negligent judgment in
falling asleep "cannot be said to be based on the purposes that
the regulatory regime seeks to accomplish." Gaubert, 499 U.S. at
325 n.7.[5]  Similarly, the negligent maintenance of gym equipment
is not governed by the exception, while the decision on how
frequently to inspect the equipment is so governed. Coulthurst,
214 F.3d at 109.  The exception therefore protects those
discretionary acts by a government employee when the choice
exercised is grounded in public policy.

The Government has shown that Rollock's acts are protected
by the discretionary function exception to the FTCA.[6]  It has
presented undisputed evidence that there was no BOP policy in
effect on January 25 requiring prison officials to prevent all
prisoners from entering housing units to which they were not
assigned, or that required prison personnel to take any specific
steps to control entry into a housing unit.  Under the system
implemented by Manifee, it was the inmates' obligation not to

_____

[5] As this Court noted when it denied the Government's motion
to dismiss at a March 28, 2003 hearing, if a corrections officer
had been asleep or reading a newspaper during a ten-minute move,
as opposed to diligently performing his functions, the officer
would not be covered by the exception.

[6] In his opposition to this motion, Doe does not argue that
the Government has failed to satisfy the second prong of the
Gaubert-Berkowitz test: "the judgment or choice in question must
be grounded in considerations of public policy or susceptible to
policy analysis." Coulthurst, 214 F.3d at 109.  Doe also does
not dispute the Government's assertion that no evidence exists to
support a finding of the type of negligence that the
discretionary function exception was not intended to protect,
such as sleeping or reading on the job. Gaubert, 499 U.S. at 325
n.7; Coulthurst, 214 F.3d at 109-10 (2d Cir. 2000).

enter a housing unit other than their own, and corrections officers balanced their supervision of prisoner movement with all of the other tasks assigned to them by exercising their discretion.

Doe conclusorily asserts that an issue of fact remains as to whether Rollock violated a non-discretionary prison policy prohibiting inmates from entering unauthorized housing units. Doe does not, however, point to any evidence in support of this conclusion.  Doe does not show that any statute or regulation would have compelled an officer to take any particular action to prevent inmates from entering housing units to which they were not assigned.  Doe also fails to present any evidence that contradicts the Government's showing that, under the ten-minute move as implemented by Manifee, an officer was allowed to exercise discretion in determining the frequency with which he checked the inmates' identification cards, and in balancing his need to check identification cards with his other duties.

Doe contends that Rollock's deposition testimony raises a disputed issue of fact regarding the existence of a duty to ensure that only inmates who resided in the housing unit entered the unit.  It does not.  The testimony to which the plaintiff points does not show that there was a non-discretionary duty placed upon a corrections officer to deny an inmate admission into a unit unless he had first verified the inmate's right to enter.  Nor does the testimony raise a question of fact regarding any requirement to check each inmate, for instance, by looking at

their identification.  Read in context, Rollock's testimony
reflects the officer's understanding that it was prison policy
that only inmates who resided in a housing unit were permitted to
enter and that one of his duties was to enforce that policy.

Doe contends that Rollock's declaration and deposition
testimony contradict each other on the issue of whether he
conducted random checks of inmates in order to ensure that no
unauthorized inmate entered the housing unit.  According to Doe,
Rollock testified in his deposition that he monitored all inmates
entering the unit, while in his declaration he stated that he
conducted random checks of inmates entering the unit.  Again, the
deposition testimony reflected no more than Rollock's
understanding that it was his obligation to regulate entry into
the unit, and that he did so.  He was not asked in his deposition
whether he understood that he had to check each inmate before
allowing entry, or how frequently he employed a particular
method, such as identification checks, in the course of his
duties.  There is no inconsistency that can fairly be used to
undermine Rollock's assertion that he had the discretion to
determine how best to perform his various duties, including his
duty to regulate entry into the unit.

Accordingly, the Government has shown through undisputed
evidence that Rollock's acts on January 25 are protected by the
discretionary function exception to the FTCA.  This Court thus
lacks subject matter jurisdiction over Doe's claim that the
Government's negligence contributed to the attack on him.

Medical Negligence

Doe contends that the Government was negligent in providing him with prompt medical care.  As a result, he suffers from "severe and permanent injuries, with attendant losses and permanent injurious effects to his health."  Doe's claim is governed by New York's medical malpractice law.[7]  "[T]o establish a claim of medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries."  Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995) (citation omitted).  "New York law further provides that, except as to matters within the ordinary experience and knowledge of laymen, expert medical opinion evidence is required to make out both of these elements."  Id. (citing state court cases). See also Barnes v. Anderson, 202 F.3d 150, 159-60 (2d Cir. 1999); Boomer v. Lanigan, 00 Civ. 5540 (DLC), 2002 WL 31413804, at *9 (S.D.N.Y. Oct. 25, 2002).

By Order dated April 8, 2003, Doe was required to produce an expert report pursuant to Fed. R. Civ. P. 26(a)(2) by September 26, 2003.  Doe failed to do so, and did not include such a report in his papers in opposition to this motion.

The Government has moved for summary judgment on this claim based on Doe's failure to prove that any of his injuries have been caused by a delay in providing him medical care.  Doe

---

[7] Liability under the FTCA is determined "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

12

responds simply that "the burden remains on the defendant to show that plaintiff has no such cause of action."  The burden is on the plaintiff to present prima facie evidence of each element of his cause of action.  Because Doe has not produced any evidence to establish a causal connection between his injuries and a delay in treatment, the Government's motion for summary judgment on this claim is granted.

Conclusion

The claim based on the Government's alleged failure to prevent an attack on the plaintiff is dismissed for lack of subject matter jurisdiction.  The Government's motion for summary judgment is granted with respect to the plaintiff's claim for medical negligence.  The Clerk of Court shall enter judgment for the Government and close the case.

SO ORDERED:

Dated:    New York, New York
          September 8, 2010

                              Denise Cote
                              United States District Judge

13